# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
### CHARLOTTE DIVISION

| | | |
|---|---|---|
| **KAREN M. RIGGS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **-vs-** | ) | **C O M P L A I N T** |
| | ) | **(Jury Trial Demanded)** |
| **WALMART, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

COMES NOW, Plaintiff, Karen M. Riggs ("Riggs") and hereby states her Complaint against the above-named Defendant by stating and alleging the following:

## NATURE OF CASE

This case involves the following:

1. Violation of the Age Discrimination in Employment Act of 1967 as amended, 29 U.S.C.A. §§ 621 to 634, ("ADEA"), as well as Title VII, 42 U.S.C.A. § 2000e *et seq*., Gender Discrimination, based on disparate treatment resulting in harassment, demotion, and a significant pay reduction, as well as Retaliation.

2. Retaliation in violation of the public policy of the ADEA, Title VII, and North Carolina, as set forth in Chapter 143, Article 49A, of the North Carolina General Statutes, "the Equal Employment Practices Act."

3. North Carolina statutory and common law actions for (1) Violation of the North Carolina Unfair and Deceptive Trade Practices Act; (2) Intentional Misrepresentation: (3) Intentional Infliction of Emotional Distress and (4) Negligent Infliction of Emotional Distress, directly and proximately caused by the actions and omissions of the Defendant, its agents, servants and employees, acting within the course and scope of their employment.

## PARTIES

4. The Plaintiff, Karen M. Riggs ("Riggs"), is an individual, female citizen and resident of Morganton, Burke County, State of North Carolina.

5. The Defendant, Walmart, Inc. ("Defendant" or "Walmart"), is a corporation, organized under the laws of one of the several states, doing business and maintaining offices in the Western District of North Carolina.

Case 1:22-cv-00207-MOC-WCM   Document 1   Filed 09/23/22   Page 1 of 29

## JURISDICTION AND VENUE

6. This Honorable Court has subject-matter jurisdiction under 28 U.S.C.A. § 1331 and supplemental jurisdiction over the plaintiff's remaining claims pursuant to 28 U.S.C.A. § 1367.

7. Both the statutes and laws of the State of North Carolina and the statutes and laws of the United States of America confer the subject matter jurisdiction of this Court.

8. Venue is proper in this Court under 28 U.S.C.A. § 1391(b) since a substantial portion of the events or omissions giving rise to the claim occurred in this District, the Defendant Corporation has principal places of business in this District, and Riggs is a resident of this District; therefore, venue is proper in the Western District of North Carolina.

## ADMINISTRATIVE PROCEDURE

9. Riggs filed a timely age discrimination, gender and retaliation charge with the Equal Employment Opportunity Commission ("EEOC") on 05/17/2021. Riggs was issued a "Notice of Right to Sue" on 06/29/2022, granting her the right to file this civil suit.

10. This Complaint is filed within ninety (90) days following Riggs' receipt of her "Notice of Right to Sue" correspondence. The Notice of Right to Sue was issued by Carmen M. Whaling, Assistant District Director of the EEOC on 06/29/2022. Riggs has satisfied all other administrative and procedural prerequisites to the filing of this Complaint.

## FIRST CLAIM FOR RELIEF
### Violation of 29 U.S.C.A. §§ 621 to 634 - Age Discrimination in Employment Act ("ADEA")

11. Riggs is a female citizen and resident of the town of Morganton, located in Burke County, North Carolina. Riggs' date of birth is April 6, 1958.

12. Riggs was hired as a Manager Trainee, by Defendant on January 17, 2000, in the Hickory, North Carolina store, number 0948. After eight weeks, Riggs began working as an Assistant Manager. She stayed at the Hickory store for six months. She was then given the same Assistant Manager position, in the apparel area, of the Morganton, North Carolina store, number 1060. Riggs stayed in that role of Assistant Manager, a salaried position, until April 10, 2021.

13. On April 10, 2021, Riggs was demoted to a third-shift, hourly-pay, stocker position, earning twenty-thousand dollars ($20,000.00) less per year. Riggs is still employed with the Defendant as of today's date.

14. At all relevant times in this Complaint, Riggs was and is a member of the group protected by the Age Discrimination in Employment Act of 1967 as amended, 29 U.S.C.A. §§ 621 to 634, ("ADEA"), namely persons over the age of forty (40), as well as a protected class of female under Title VII, 42 U.S.C.A. § 2000e *et seq.*

15.  In the calendar year of 2020, Riggs took time off from work to have heart surgery. After Riggs' heart surgery procedure was complete, she returned to work.

16.  Anthony Trent ("Trent"), a District Market Manager with the Defendant, told the Store Manager at the Granite Falls store, where Riggs worked at the time, Keenyn Norman ("Norman"), to give Riggs a below-standard or bad evaluation.  Upon information and belief, this was due to Rigg's age and gender.

17.  Upon information and belief, Trent had instructed local management to give at least two bad evaluations, even if they were undeserved, in order to use them as leverage against the associates, including but not limited to Riggs, because the Defendant was in the process of doing a restructuring, and was looking to get rid of older employees.

18.  On March 9, 2020, Riggs was working at the Granite Falls store, number 4410, and was given this below-standard bad evaluation by Norman.  However, Riggs had no current write-ups, coaching or disciplinary actions against her, so she should not have received this below-standard evaluation, per company policy.  The giving of this below-standard evaluation was directly in contradiction to Defendant's own standards of practice.

19.  Riggs was working at this Walmart Store in Granite Falls, when the Assistant Managers were told of the restructure.

20.  In October 2020, Riggs was moved from the Granite Falls store to the Morganton store, number 1060, still in the Assistant Manager position.

21.  In the Fall of 2020, Defendant's management was methodically taking away Riggs' associate help, and moving them to different shifts, and to different areas of the store.  Upon information and belief, Riggs' associate help was purposefully being taken from her because of her age, gender, including Defendant's desire to harass Riggs and ultimately force her to quit or resign her position.  These actions of Defendant proximately caused Riggs pecuniary loss, mental anguish, emotional distress and created a hostile work environment for Riggs.

22.  In the Fall of 2020, store co-manager at the Morganton store, Amanda Atwood ("Atwood"), told Riggs, "*you bought a pair of those pants;  they make you look like an old woman,*" while working together in the apparel section of the Morganton store and speaking about a piece of apparel.  This exchange was insulting, embarrassing and humiliating Riggs. Upon information and belief, this type of language, exchange and treatment from management is different than the treatment given to similarly situated, younger associates.

23.  Atwood and Store Manager Kim Hefner ("Hefner") both would often speak loudly and scream at Riggs, all the while speaking in a demeaning tone, in front of other associates and customers.  Younger, similarly situated associates, were not treated in this manner.

24.  Also during this timeframe, Atwood instructed Riggs to go to Receiving and help her put some merchandise up-high for storage.  Riggs got up on a ladder and was going to lift something up for storage.  Atwood told Riggs to put this down because she might "*split open the*

*scar on your chest.*" This comment was made in front of approximately three other employees. This was embarrassing, humiliating and hurtful to Riggs. Upon information and belief, this treatment was done because of Riggs' age, highlighting the fact that Riggs recently had heart surgery.

25. Riggs was intentionally not given appropriate work support to do her job. She was treated differently than the other similarly situated, younger assistant managers and associates, in this regard.

26. One example of this was on Monday, November 2, 2020, Riggs came in on her day off to work with four of her associates who were there. Riggs was working with Sheila H. ("Sheila"), a produce member, and a front-end associate.

27. Hefner went on the walkie-talkie and announced, "this is ridiculous" that Riggs has four people working with her. Then, while still on the walkie-talkie, Hefner pulled Riggs' associates and had them work elsewhere to do store returns.

28. Riggs continued to work on her day off to improve conditions. Riggs was very disappointed that Hefner did not allow her to follow-through with her work plan, and that Hefner made these announcements over the walkie-talkie to the whole store, where even the hourly associates heard the direction and the comment Hefner made. This was so disheartening, that Riggs cried on her way home.

29. On Tuesday, November 3, 2020, Riggs' schedule was changed to come in at 4:00 AM. Riggs came in to work with her associates and complete their plan to work in apparel. At around 7:00 AM, the front-end associate made an announcement over the intercom, that the store manager (Hefner) said to pull all of the apparel associates out of the apparel department to work returns and other jobs throughout the store.

30. The front-end associate told Riggs that Hefner had instructed her to make sure to announce this over the intercom, so that the whole store heard it. The front-end associate apologized, that she was only doing this because Hefner made her do it, and that she did not want to embarrass Riggs.

31. Riggs got physically sick to her stomach and started having chest pains. Riggs called the manager on duty and told them that she had to leave. Riggs called Resources for Living. Resources for Living is provided to associates for assistance.

32. Riggs called the hot-line number and told them that she was afraid to go home. Riggs was instructed to leave, and that they would record the telephone call, as reporting for her absence.

33. Atwood and Hefner were methodically making Riggs' work more difficult, if not impossible, to perform and adversely changing her work schedule.

34. This removal of Riggs' associates, after being instructed to come into work, process and stock freight, and being intentionally and maliciously announced over the intercom, is abusive and harassing, completely embarrassed, distressed and upset Riggs, who had made a special trip to come into work for this task. As a result of this, Riggs became physically ill, threw-up, was shaking and unable to perform her work duties.

35. Riggs had been specifically told to schedule her associates for this freight processing. Riggs scheduled the associates. Riggs came in to work the freight processing and over the intercom in front of the whole store, Hefner had it announced that Riggs' associates were to report to the service desk and do returns, thus leaving Riggs to do all the heavy freight processing herself.

36. Riggs sought medical attention at her family doctor's office. Once out on approved leave, and after being told to take the leave, Defendant sent Riggs a text message saying that they had looked at the doctor's statement and didn't know if they could still approve the leave of absence and inquired as to why Riggs was out.

37. Riggs asked if they received the doctor's statement and if the statement was approved, to which Defendant said "yes." Riggs told Defendant that she was calling her doctor, that she didn't think Defendant could approve her leave and then subsequently contact her and say it did not want to approve said leave.

38. Riggs called her doctor. Defendant told her to call them back. Riggs tried for several hours, left messages and was hung-up on. Around 4:00 PM Defendant sent Riggs another text advising her that the leave was approved. This whole incident added to, and further caused Riggs to suffer more mental anguish and emotional distress, to approve the leave and then try and take it away from her.

39. Upon information and belief, Defendant was trying to cover-up why Riggs went out on leave, which was because of the mental distress from work, that Defendant itself was causing Riggs.

40. In late November 2020, Riggs took this two-week leave of absence, on her physician's instructions, due to the work-related stress. Riggs' doctor suggested that she see a psychiatrist to help her with her work stress. Riggs went to see the psychiatrist to discuss the work stress and situation at work.

41. A male, third-shift assistant manager, had previously gone to Defendant's Resources for Living, due to work stress. Another assistant manager told Riggs that Defendant was watching this male associate on camera, and was attempting to find a reason to terminate him. This male associate was later written-up. Ultimately, he left and took a different position in another store. However, he lost his assistant manager position.

42. This hostile environment made Riggs feel as though Defendant was observing associates who filed with the Defendant's Resources for Living department, and trying to find reasons to terminate them.

43. Because of this hostile environment, Riggs was nervous about going back for additional visits to the psychiatrist. Riggs was scared and anxious for her job security. She was afraid and anxious that Defendant would turn-around and do the same thing to her as it did with the other associate. Upon information and belief, Defendant was observing Riggs, as well as any other associate who files with Resources for Living, subsequent to her filing with Resources for Living and was looking for reasons to terminate her.

44. Defendant's Home Office suggested to Riggs that she speak with Rusty Evans ("Evans"), District Human Resources Manager, and "partner with him" upon her return to work. Evans and Trent let Riggs' store know that they would be there to meet with her upon her return to work.

45. Riggs was glad to have the opportunity to share her concerns regarding her work environment with Evans upon her return from her leave of absence. However, this did not happen.

46. Upon Riggs return to work from the medical leave of absence, Evans made the appointment to speak with Riggs in person, about her leave of absence and the problems she was having at work.

47. However, the store co-manager at the Morganton store, Atwood, intentionally mislead Riggs, and told her at the last minute to come in late to work on the day of the appointment with Evans, thus causing Riggs to miss the appointment with Evans. Evans had been there all day waiting on Riggs.

48. Upon information and belief, Evans had express and direct knowledge of the various instances of age and gender discrimination Riggs was experiencing at work.

49. On November 19, 2020, Riggs had sent an email to Evans and told him that she wanted to speak with him about her concerns with what was going on at work at the time. Evans did not respond.

50. On December 9, 2020, Riggs emailed Evans and Kate Morrow ("Morrow") a vice-president, about the hostile and discriminatory treatment she was experiencing at work, and requested to speak with Evans about an open door issue. Evans called Riggs and advised here that he could not help her with the issue on November 3, 2020, of seeking medical attention, and did not want to get caught in the middle of this. Riggs told Evans that she had struggled ever since coming to store 1060, because her associates and herself were restricted from working in her areas, and that now they were changing Riggs' associates' shifts to other assistant managers. Riggs told Evans that she received a below standard evaluation in 2020 and he told her he did not want to get caught in the middle of that. Evans was not helping Riggs, when he and Morrow had authority to address these issues. Riggs' concerns were being ignored by HR and upper management and her work problems were not being addressed, even though she was trying to go through proper channels.

51.  However, Evans violated Riggs' confidentiality, because he told the co-manager of the Morganton Store, Atwood, as well as the store manager, Hefner, about this email.  Atwood and Hefner then called Riggs to the office to ask her what the email was about.  This was hostile, embarrassing and stressful to Riggs.  After this conversation about Riggs contacting higher management and Human Resources, Riggs' associates began getting changed in the schedule to different times and shifts.

52.  Therefore, Riggs was afraid to contact Evans moving forward about other instances of discrimination and hostile actions at work, because he broke her confidentiality with the Open Door Policy.  Riggs did not trust Evans to keep her information confidential from her store managers, the people Riggs was complaining about.  Upon information and belief, this treatment was because of Riggs' age, and part of the hostile work environment, Riggs was enduring at work.  Upon information and belief, younger, similarly situated associates did not receive this type of hostile treatment at work.

53.  Evans later emailed Riggs saying "good morning" and asking Riggs if she is requesting an open door with him.  Riggs told Evens "no" because he broke her confidentiality and trust.  Evans was not addressing Riggs' concerns.

54.  Riggs then called Trent, regarding the work stress and discriminatory treatment she was receiving.  Subsequently, Hefner told Riggs that Trent had called her and said that she better check on Riggs, because Riggs is asking to speak with him.  However, Trent did not even return Rigg's call.  Trent did not address Riggs' concerns.

55.  Subsequent to contacting Evans in Human Resources about the open door issues, in December 2020, Atwood and Hefner took Riggs and her associates out of her apparel area and put them in housewares and other general merchandise departments in the store.  Also, Riggs' associates were changed away from Riggs' shifts to other shifts and Riggs began being scheduled to a lot of closing shifts.  These actions were done in retaliation for complaining about her working conditions to Human Resources.  There were nights when Riggs had basically no associates to help her in her apparel area, because they were changed to day shifts.  Riggs' schedule was changed to more night shifts, while other managers were given less night shifts, as a proximate result of Riggs using Defendant's open door policy.

56.  However, Riggs was expected to get the same results, with basically no associate help.  When Riggs brought this up to management, she began to get negative comments in the manager meetings.

57.  Also, in December 2020, Atwood and Hefner took freight that was supposed to go to Riggs' apparel area and put it outside behind the store in trailers, making it inaccessible for Riggs and her associates.

58.  During the week of Christmas 2021, one of the most important weeks for Riggs' apparel area for sales, Riggs, the Cap-Team 4 to 1 shift, as well as department supervisors were moved to housewares, helping a male manager, Tyler G. ("Tyler"), in his department.

59. Riggs spoke with Hefner and informed her that she was worried that they had around 125 pallets of unworked apparel freight. Hefner said, "Okay" and then pulled all the apparel freight to the outside trailers, where it was left throughout the Christmas season. This negatively affected Riggs' sales numbers and therefore negatively affected her work performance putting her job in jeopardy.

60. Trent sent an email to Riggs asking her way all of her apparel departments were not making the sales projections, thus further jeopardizing Riggs' employment with Defendant. There was a systematic attempt to retaliate, discriminate, harass and attempt to get Riggs' terminated from employment, which proximately caused mental anguish, emotional distress and pecuniary loss to Riggs.

61. Riggs also received an email from Danny B. ("Danny"), assistant market manager, in January, showing the profit and loss statement suffered in Riggs' apparel department, due to these actions taken against her.

62. Walmart was planning a company and market-wide restructuring in 2021, that would adversely affect Riggs' and others jobs.

63. Regarding the upcoming restructuring process, in December 2020, Evans told Hefner that Walmart could not just take these jobs from the associates, during the 2021 restructuring, including but not limited to Riggs, as this would be illegal.

64. Hefner relayed this information to Riggs. Later, Riggs was speaking with David Scott ("Scott") an Assistant Manager in the Lenoir store. Scott said that Evans had also told him that Walmart could not take the associates' jobs, because this would be illegal.

65. Hefner intentionally and maliciously misled and lied to Riggs and told her specifically that there would be no need for her to look for another job, because she would not loss her job.

66. The acts of the Defendant, by and through its agents, servants and employees showed an ongoing, systematic and intentional harassment and discrimination against Riggs, because of her age. Riggs was meeting the Defendant's work expectations as she had for over twenty years. Riggs was treated less-favorably than younger similarly situated associates. Upon information and belief, these actions against Riggs were done to her because of Riggs' age, gender, and the intention of Defendant have Riggs resign her position as assistant manger.

67. Riggs was instructed by the Defendant to look for another job outside of her market or step-down, and in the process she would have to take a twenty-thousand dollar ($20,000.00) reduction in pay.

68. Defendant, through its agents, servants and employees, expressly told Riggs specifically, that if she did not step-down from her assistant manager position, then she would be terminated from her employment.

69. Two other assistant managers, over the age of forty (40) were also told to either go outside the market or step-down, with a corresponding pay reduction. One African-American male Assistant Manager, Harold Grier ("Grier"), over the age of 40, was told by Elah Brantley ("Brantley"), the Store Manager at Granite Falls, the day before his job would end on April 10, 2021, that he would have to step-down or, "they [Walmart] are going to fire you tomorrow."

70. Upon information and belief, these actions of Defendant are part of a systematic and intentional process of the Defendant to get rid of older workers over the age of forty, reduce their pay, and replace them with less qualified, younger workers, requiring less pay.

71. A number of the lead associates jobs that Defendant provided during the restructure were given to the younger, less-qualified associates.

72. Defendant was trying to get Riggs to take a significantly lower-paying job, that paid her by the hour instead of the salary, she had been receiving for many years.

73. Riggs was a salaried, assistant manager, working first and second shift; however, she was demoted to an hourly-paying, third-shift, stocker job. Other, less-qualified, younger, male employees, were offered and given the new lead positions. Riggs was qualified for these positions, as she had been an assistant manager for over twenty-years. The new lead positions are on par with the old assistant manager positions. The new positions are part of the restructuring of the company, that was going on during 2021.

74. Defendant also took Riggs' vacation time from her, after forcing her to step-down. Conversely, other associates who had to step-down were able to keep their vacation pay. After complaining about this many times, the Defendant ultimately gave back the vacation pay; however, it attempted to take the benefit from Riggs, and would have done so, without her vigilance and complaining about the unfair treatment. Upon information and belief, this denial of benefits reflected the intent for Riggs to resign her position, because of her age, and the desire to replace older associates with younger, less-qualified associates making less money.

75. Upon information and belief, Defendant was actively and intentionally seeking younger associates, with less experience, requiring less pay, to replace the older associates, who were making more money.

76. Defendant removed the new jobs from its internal system, so that the associates it was getting rid of could not sign-up for the positions. Defendant took all the requisitions out of the system, to force the older employees to quit, step-down, lose their jobs and not be able to see the available new jobs from the restructure. This was a pattern and practice of the ongoing age discrimination.

77. Hefner told Riggs that all she had available for Riggs was an associate position in the apparel department. This was not true. Later, Hefner told Riggs that she could have a stocker job, making $1.50 more per hour. This is how Riggs' shift got changed and how she was forced to step down. All of these actions were calculated and discriminatory to Riggs, because of her age, and gender, and a calculated desire to have her leave the Defendant company.

78.  Hefner actively recruited Kemp Law ("Law"), a younger, male assistant manager, in his early thirties, who worked with Riggs at the Granite Falls store, and offered him one of the new lead positions.  This position was for a new Team Lead for third-shift.  This position was at the Morganton store, number 1060.  Riggs was more than sufficiently qualified for this position, given her experience and training.

79.  Hefner instructed Law to sign-up for this job.  Hefner interviewed Law and gave him the job.  However, Hefner told Riggs that there was not a job available to her.  This was intentionally and maliciously misleading and discriminatory, harmful economically and emotionally to Riggs.  This was damaging to Riggs.

80.  Hefner told Law that he could not start until after April 10, 2021, in that way Riggs could not say anything about the job, and being told by Hefner that there was not a job.  This was an intentional plan to keep Riggs from this new job, and force Riggs to either resign or take a much less desirable job, making, it turns out, twenty-thousand ($20,000.00) less per year.  Riggs was forced from a salaried assistant manager position, to an hourly-paid, third-shift stocker position. Riggs is a female, over the age of 40, who was demoted, while performing to her employer's legitimate expectations, and was replaced by others of comparable qualifications, who were substantially younger than her, and male.

81.  Hefner actively recruited Law for this position, by calling the Store Manager at Granite Falls, Leah Brantley ("Brantley"), to tell Law that he could have this job.  Law told Hefner that he would take the job.  Hefner told Law that he would start after April 10, 2021.  He ultimately hold Hefner he was not going to take the job.

82.  During a subsequent conversation, Hefner told Riggs that Law was not going to take the job.  Riggs asked Hefner if she could have the position, and Hefner told Riggs "No.  I want Andy to have it.  I'm going to give it to Andy."  Andy is a younger, male employee, with less experience and less qualifications than Riggs.  Hefner did offer Andy the position;  however, he turned down the offer.  Riggs was not offered the position, although qualified for the position.

83.  Next, Hefner then transferred in a younger, male associate, "Chris," for this position, who had a disciplinary action write-up, and gave him the job.  Chris did not make it and ultimately quit the position.  This is three other younger male associates being offered this new lead job over Riggs, and is a pattern and practice of offering the new lead position to younger, male associates, with less-qualifications for the position.

84.  Defendant gave "Eric" a Coaches Position on third-shift, at the Granite Falls store. He was told, you can be an Assistant on third-shift.  He walked-out and quit.

85.  Upon information and belief, if Eric had known that there was a severance package, then he would have taken the severance package.  Riggs, Eric and others were not told that there was a severance package option.  This failure to advise of the severance package option during the restructure process is a violation of Defendant's own written policies.

86. Defendant intentionally misrepresented to Riggs, and others, that their was no severance package option, which was against its own company policy. This forced older workers to step-down without a severance package.

87. This also happened to Scott Swank ("Swank"). He was forced to go to the Lenoir, North Carolina store. He did not like this and quit, after being a long-term associate with Defendant. Like Riggs, he was not offered a severance package. This failure to offer Riggs, and others, a severance package option during the restructure was an intentional misrepresentation and against Defendants' own written company policy.

88. Multiple employees, including but not limited to Riggs, were intentionally and systematically not advised about the severance package option, forcing them to take lower paying jobs. Upon information and belief, Defendant was targeting older associates.

89. Defendant submitted the Associates Severance package policy to the Equal Employment Opportunity Commission ("EEOC") during the Administrative Process in this case. This is the incorrect policy. In her Reply, Riggs submitted the correct, Revised Management Severance Package Policy, to the EEOC.

90. Defendant submitted that Riggs was not qualified for the severance package, due to a write-up and disciplinary action. This is false. To the contrary, the Revised Management Severance Package Policy states that the Defendant cannot hold disciplinary actions against associates during the transfers resulting from the restructure. Upon information and belief, Defendant misled and was not truthful to the EEOC, regarding the severance package policy, and how it applies to Riggs.

91. As per the Defendant's own severance package policy, employees were to be given a physical, severance package packet. Defendant did not provide this physical, severance package packet to Riggs, as well as others.

92. Three different Store Managers falsely told Riggs that there was no severance package or packet available to her, during this restructure process. This was intentional false and misleading information told to Riggs.

93. Evans told Riggs, "There will be no severance or severance package offered." This statement is an intentional misrepresentation of fact.

94. Defendant cheated many associates, including Riggs, out of the severance package option. This saved Defendant significant money and correspondingly deprived the associates, including but not limited to Riggs, of their proper employee benefits.

95. Upon information and belief, this failure to inform Riggs about the severance package option was done to Riggs because of her age, length of service, pay scale and seniority, with the intention to harm and significantly reduced Riggs' income, wages and benefits.

96. At the time of the restructuring, Defendant had a written-policy stating that write-ups, disciplinary actions or bad evaluations were not supposed to be held against associates, during the restructure process.

97. However, Hefner told Riggs that her negative write-up stands for "everything." Hefner took Riggs' bonus away, because of this write-up. Also, Hefner was intent on making sure that Riggs did not get one of the new managerial jobs. This is illegal employment discrimination, in violation of the ADEA.

98. The write-up in question occurred in approximately March 2021, when Hefner changed Riggs' schedule, to come in to work at 5:00 AM. Riggs came in and entered the front of the store, as was her habit. However, the check-in table had been moved to the Garden Center. Riggs was not aware of this recent change. Riggs was not used to coming into work at 5:00 AM and did not know that someone would be out in the Garden Center at that time. The Garden Center itself is not open at 5:00 AM in the morning.

99. Riggs made her way to the check-in table, about 25 or 30 minutes after 5:00 AM, when she figured-out that this is where the check-in table was located. Riggs tested negative for Covid-19 symptoms and temperature; however, Hefner wrote Riggs up for failing to check-in and get her temperature checked, etc. at 5:00 AM. Atwood and Hefner were both present at the check-in table.

100. Hefner said that Riggs could have put customers at risk for Covid. However, the store does not open until 7:00 AM, so there were no customers in the store at this time.

101. Upon information and belief, both Atwood and Hefner were being hostile and discriminating against Riggs by trying to keep Riggs from being eligible for any new promotions to managerial positions or get a bonus, because of Riggs' age, as well as gender, thus creating, enforcing and implementing a hostile, abusive, and discriminatory work environment for Riggs.

102. As per Defendant's own company policy, it takes two managers to write-up an employee. Both Hefner and Atwood were present and participated in Riggs' write-up, for allegedly failing to go through the health check-up in a timely manner.

103. Hefner told Riggs at the time of the write-up, "This write-up stands for a Red Coaching, and everything that applies with it, including that you will not get a bonus or increase in salary." However, during the restructure, the Defendant was not supposed to use write-ups against management. Still, Hefner used the write-up against Riggs. This action proximately caused Riggs a twenty-thousand dollar ($20,000.00) reduction in pay, other financial harm, mental anguish and emotional distress, humiliation, embarrassment and pain and suffering, during and after the restructure process, continuing to this day.

104. Upon information and belief, these discriminatory and hostile actions were taken against Riggs because of Riggs' age, gender, as well as in retaliation after Riggs went to the Doctor and had a leave of absence due to work stress, reported the work discrimination to Human Resources through the open door policy, and management then retaliated against Riggs

for these protected activities. Other, similarly situated younger associates were not mistreated in this manner, all in violation of the ADEA.

105. Juxtaposed to Riggs' write-up, Atwood witnessed a younger, male associate that did not go through the health check-in, the same as Riggs. However, Atwood did not harass the younger, male associate or write him up, even thought the circumstances surrounding the events of the write-up were similar to Riggs. Also, there were actually customers in the store, during this failed health-check for the younger, male associate. So, the younger, male, employee received better treatment, than Riggs, when the younger, male employee had more egregious facts, as well. This is all part of the pattern and practice of direct violations of the ADEA, as well as Title VII.

106. This happened yet again, when another younger, male associate came through the front door and did not complete the health check-in. He was told to go to the Garden Center and perform the health check-in, but he was not written up. Again, Riggs had been written up, for essentially the same action. Also, customers were in the store during this failed health check-in as well, contrary to when Riggs checked-in, and there were no customers in the store.

107. These are two specific instances, where younger, male associates were treated substantially different and dissimilar than Riggs, under the same or similar circumstances, all in violation of the ADEA and Title VII, thus showing a pattern and practice of employment discrimination.

108. After the restructure process was complete, and when Riggs had been an hourly, third-shift stocker for a period of time. Riggs was offered a job in Hickory, but later told she could not have the job, because of this write-up, thus adversely affecting her employment. This is violative of Defendant's own company policy surrounding the restructure and write-ups.

109. Hefner gave the position to Patrick Starks ("Starks") a similarly situated, younger, less-qualified, male associate in his early thirties. He actually went to school with Riggs' son. Starks ultimately stepped-down from the job, because he did not want the responsibility.

110. Riggs was not offered a severance package, in violation of Defendant's own written employment policy. Upon information and belief, this was an intentional, deceitful, discriminatory, and systematic failure to provide benefits to older employees, including but not limited to Riggs, and save money for the company, while attempting to replace the older associates with younger, less qualified associates, with less time, who could be paid less wages, thus saving the Defendant money.

111. Riggs, and other associates, were intentionally lied-to, mislead and misinformed about the severance package option, available to associates during the restructure process.

112. Riggs' age was the motivating factor in Defendant's decisions to:

      (1) intentionally and systematically take Riggs' associates from her apparel area and move them to other areas, leaving Riggs with no help.

(2) telling Riggs to come in early, then over the work intercom move her apparel associates to other areas, embarrassing, harassing and demeaning Riggs, causing her to break down.

(3) make verbally abusive, demeaning, humiliating, hostile and discriminating comments to Riggs, regarding her age, in front of other associates, like "those pants make you look like an old woman" and "don't burst your scar on your chest open" from your heart surgery.

(4) force Riggs to look for another job outside the market, quit or step-down, during the restructure process.

(5) not advising of or offering Riggs the severance package, expressly against Defendant's written policies regarding severance packages.

(6) when finally given information about the severance policy, Riggs was given just a calculation, and not the full management severance guideline policy, that explains the whole severance policy as it relates to the restructure program.

(7) write-up Riggs for health check in procedure issues, when two other younger, similarly situated male associates did not get a write-up for the same or similar infraction of company rules.

(8) failing to promote and offer the new Lead job in the Hickory store, for which Riggs was qualified, to three other substantially younger, similarly situated, less qualified, male associates outside of Riggs' protected classes of age and gender.

(9) not advise Riggs of this job, or other job openings, available to her during the restructure.

(10) to force Riggs to take an hourly-pay, third-shift stocker position, removing her from her salaried, Assistant Manager position that she had held for many years, with a corresponding pay-cut of twenty-thousand dollars ($20,000.00) per year.

(11) and, including but not limited to other actions by the Defendant outlined herein this Complaint.

113. This conduct was discriminatory age-based employment discrimination, created a hostile work environment, was on because of Riggs' age, and was sufficiently severe and pervasive to alter the conditions of Riggs' employment.

114. During the restructure process, Riggs sent a survey response regarding the restructure process, the new "Teams" and the new procedures, to the company Chief Executive Officer ("CEO") and another person in the chain-of-command.

115. After completion of this survey, when Riggs went into work, Riggs was instructed to call the market office, at 10:00 PM. Riggs said that, "they are not there at that time." However, she was told by her third shift Lead, Chris, "Yes they are; they are waiting on you to call." This call was with Danny Biebemen, Assistant Market Manager to Trent.

116. After this telephone call, Riggs was finally offered a severance package. This is when Riggs found out that there was in fact a Walmart, Inc. management severance guideline policy. Evans sent a cut-out, one-page of the written severance package policy to Hefner, who gave it to Riggs. Upon information and belief, Evans cut out significant portions of the management policy, and only included the minimal-information, base calculation for Riggs. However, Riggs called another market, and had them send her the entire management severance guideline policy.

117. This severance package policy is contrary to the fact that Riggs was told by multiple management personnel that there was no severance policy. This was not true and was intentionally misleading provided to Riggs.

118. Upon information and belief, the younger, male associates ultimately promoted to the Lead position was less qualified than Riggs and did not meet the minimum requirements posted by the Defendant to make an application or to be considered for the Lead position.

119. Riggs was expressly told by Hefner, that a younger male employee was being offered the position and not Riggs. Upon information and belief, this failure to promote was because of Riggs' age, and in violation of the ADEA - Age Discrimination in Employment Act of 1967.

120. Riggs, an Assistant Manager for many years, was given a third-shift stocker job, at with substantially reduced pay of twenty-thousand dollars ($20,000.00) per year. This is a significant and meaningful reduction in pay. This is age-based employment discrimination, in violation of the ADEA.

121. Riggs was demoted on April 9, 2021 and started her new job on April 10, 2021, as a hourly, third-shift stocker. The store manage, Hefner, advised Riggs that she would start as an hourly, third-shirt stocker on April 10, 2021. Riggs had been a salaried, assistant manager for many years.

122. Riggs was told by the District Human Resources Manager that the Regional Vice-President could not help her with issues at work.

123. Riggs had responded to management concerning the severance package option and negotiations; however, management failed and refused to contact Riggs back, all in violation of Defendant's own company policy.

124. Upon information and belief, there was a systematic and calculated attempt to force Riggs to quit and resign her job, because of Riggs' age, and gender.

125. Riggs was told to look outside her market or take a twenty-thousand dollar ($20,000.00) reduction in pay. This amount is approximately one-third (1/3) of Riggs current salary. Upon information and belief, Defendant was actively seeking younger associates at less pay.

126. Defendant's written policy was to offer pay protection through October 22, 2021. However, this was not done in Riggs' case. This was a written guarantee of job protection that was not followed by the Defendant.

127. During the telephone call, regarding Riggs' survey, Riggs asked Anthony Trent's District Assistant, Danny Biedermen ("Biedermen"), about this, and Biedermen said, "maybe they changed their mind" in a dismissive, abrupt and curt manner. This evidenced the misleading, noncaring, dismissive, untouchable, arrogant, discriminatory, aggressive and hostile corporate culture at Defendant.

128. After Riggs spoke with the Human Resources Department in November and December 2020, Riggs was retaliated against by having her schedule changed by management, in that she was forced to work three, four, and sometimes five nights a week, where other similarly situated assistant managers were not required to work these shifts, when in fact there is a company policy requiring assistant managers to close certain nights per schedule. Riggs was given more closing shifts than required while others were given less.

129. Upon information and belief, other similarly situated substantially younger assistant managers were not given these night shifts on a consistent basis, as was Riggs.

130. Upon information and belief, these actions by the Defendant are examples of systematic and intentional age discrimination, in violation of the ADEA.

131. Riggs is a (1) member of two protected classes, being a female, who is over the age above 40; (2) suffered adverse employment action; (3) was meeting her employer's expectations at the time of the numerous adverse employment actions; and (4) was replaced by or treated less favorably than those outside of her protected classes of age and gender, and someone "substantially younger."

132. As a direct and proximate result of this age and gender discrimination, Riggs has sustained pecuniary and non-pecuniary damages, financial losses, mental anguish and emotional distress, stress, embarrassment, humiliation, ridicule and other damages, for which she is entitled to recover.

133. The adverse employment actions were improperly motivated by Riggs' age. "But for" Riggs' age, she would not have been subject to ongoing harassment, aggression, hostility, and discrimination, including but not limited to, being demoted to an hourly third-shift stocker

from a salaried, assistant managerial position, and given a forced significant decrease in pay as well as blocked from the new Lead Positions, lied-to about the Lead Position availability, which Lead Positions were given to substantially younger, male associates, all in violation of the ADEA.

134.   Riggs' age was the motivating factor in Defendant's decisions to harass, demote, significantly reduce her pay by twenty-thousand dollars ($20,000.00), fail to promote, fail to discipline equally, and fail to provide the management severance package or apply the severance package rules appropriately, all to Riggs' pecuniary and non-pecuniary damage.

135.   After Riggs voiced her objection to the discriminatory conduct through the Defendant's open door policy, and Resources for Living, Riggs suffered significant adverse employment action, as outlined herein.

136.   Riggs was more qualified for the Lead positions than other younger male employees, however the younger, male employees were offered those positions instead of Riggs, all to her damage.

137.   Defendant violated the Age Discrimination in Employment Act of 1967 by demoting and forcing a significant reduction in pay to Riggs and discriminating against her in the terms, conditions, and privileges of her employment, because of her age and in retaliation for going out on medical leave, and voicing her complaints about the corporate treatment, through Defendant's open door policy.

138.   As a direct and proximate result of the age discrimination and retaliation, Riggs has sustained financial losses and suffered emotional harm, for which she is entitled to recover.

139.   At all times relevant to this Complaint, the agents, servants and employees of Defendant were acting within the course and scope of their employment with Defendant corporation Walmart, Inc.

140.   The actions and omissions of Defendant, through its agents, servants and employees, acting within the course and scope of their employment, directly and proximately caused damages to Riggs, including, but not limited, to pecuniary and other economic damages, lost wages, lost benefits, mental anguish and emotional distress, reputational harm, humiliation, and other direct and consequential damages and costs, all in violation of the Age Discrimination in Employment Act of 1967 (ADEA).

## SECOND CLAIM FOR RELIEF
### Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e *et seq.*
### Gender Discrimination

141.   Riggs incorporates by reference paragraphs 1 to 140 above, as though fully set forth herein.

142. The new Lead Position in the Hickory store, after the restructure, was offered to younger, less-qualified male associates and not to Riggs, a female associate, who is more qualified for this position.

143. The health check disciplinary actions were more harsh for Riggs, a female associate, when compared to the other three, younger male, associates, outside of Riggs protected class, who had the same or more severe health care check procedure infractions, yet the younger male associates received more favorable treatment, and significantly less disciplinary action or no action whatsoever, compared to Riggs.

144. Riggs is a member of a protected class, female.

145. Defendant took adverse employment actions against Riggs, including but not limited to the following: (1) failure to promote when other younger, less-qualified male associates were promoted in her place; and (2) more aggressive and extensive disciplinary action, when compared to younger, male associates who were involved with the same alleged health care check-in violation, yet the male associates received little to no disciple, when compared to Riggs.

146. Riggs was very well qualified for the new Lead Positions, as she had been an assistant manager for approximately twenty years, which is a similar position to the newly created Lead Positions. This is juxtaposed to the younger, male associates, who had less experience and were less qualified than Riggs; however, the male associates were offered the Lead Positions and not Riggs. Riggs was directly told by her manager that the younger, male associates, and not her, were being offered the new Lead Positions.

147. Riggs manager Hefner told her expressly that there was not a Lead Position open for her; Hefner intentionally looked to fill, and did fill, this Position with younger, male employees.

148. Hefner and Atwood directly, expressly and explicitly implemented less punishment and discipline to the younger, male associates than Riggs, when they all had basically the same alleged infraction, and Riggs even less, of not fully following the health check procedure when entering the workplace.

149. The Lead Position was in fact filled by younger, male associates, with less qualifications than Riggs. Riggs was not told about the position. Riggs was in fact told by Hefner that there was not a Lead Position available.

150. This disparate treatment gender discrimination violates Title VII and has proximately caused damages to Riggs, including compensatory damages, lost wages, lost benefits, back pay, front pay, lost opportunity, emotional and mental distress, humiliation, aggravation, embarrassment, and other damages and costs including but not limited to punitive damages, due to the malice and reckless indifference of the Defendant.

**Retaliation - in Violation of the ADEA, Title VII, and North Carolina Public Policy
as set forth in Chapter 143, Article 49A, of the North Carolina General Statutes, "the
Equal Employment Practices Act."**

151.   Riggs incorporates by reference paragraphs 1 to 150 above, as though fully set forth herein.

152.   After Riggs went out on the leave of absence, due to work stress in November 2020, as a result of specific treatment from Atwood and Hefner, and reporting work incidents to Human Resources through the open door policy, Riggs was subsequently scheduled for a number of night shifts.  However, a number of other, similarly situated associates, were not given the same heavy night schedules, as was Riggs.  Defendant was making Riggs' work situation significantly more difficult, by purposefully changing her work schedule to a less desirable and intolerable level.

153.   Riggs was also forced to perform closing store duties, and was unable to work continuously with her associates, who were there throughout the day.

154.   This change in schedule to a number of night shifts was a materially adverse action against Riggs, done in retaliation for Riggs taking a leave of absence due to work stress, reporting work problems to Human Resources, who in turn told Rigg's managers without Rigg's authority, thus violating Riggs' confidentiality and the open door policy, which is a protected activity.

155.   Store co-manager, Atwood, and store manager, Hefner, were in charge of making Riggs' schedule and making these changes.  Atwood and Hefner were intentionally retaliating against Riggs, for her participation in the protected activities outlined herein.

156.   There was a scheduling template that Atwood and Hefner were supposed to use for scheduling;  however, they did not use this scheduling template, when it came to Riggs' scheduling.  Thus, Riggs was being treated differently and less favorably, than other similarly situated associates, and in retaliation for Riggs' participation in protected activities, such as going out on a leave of absence and reporting to Human Resources through the open door policy.

157.   Riggs had been out a total of two weeks on her medical leave of absence, due to work stress.

158.   Going out on a leave of absence due to discriminatory work treatment due to Riggs' age and gender, and the resulting ongoing stress, and Riggs' communications and complaints to her superiors, including but not limited to Evans, with Human Resources, are protected activities under the Age Discrimination in Employment Act, Title VII, and North Carolina public policy.

159.   During the busiest time of year in Christmas of 2020, Defendant made the directive to put all the apparel freight on the outside trailer, and moved Riggs and her associates to housewares.  This hurt Riggs' sales and profitability for her area.  The District Manager even

inquired as to why Riggs' sales were down. An Assistant Manager could lose their position with a significant decrease in sales. This was done in retaliation for Riggs reporting her work scheduling problems to Human Resources. Human Resources violated Riggs' confidentiality and this further caused retaliation against Riggs.

160. These decisions to move Riggs and her associates to housewares, during the busiest time of the year, was in direct retaliation for Riggs going out on medical leave and requesting to speak with Evans about what was happening at her job, with Atwood and Hefner.

161. Riggs was further demoted resulting in a $20,000.00 pay reduction to a third-shift stocker position from a salaried assistant manager position, was not offered a severance package in violation of Defendant's own policy regarding severance packages, and not offered new Lead Positions after restructure, all in retaliation and directly because of Riggs' participation in protected activities outlined herein.

162. As a direct and proximate result of Defendant's retaliation against Riggs, she has been damaged and is entitled to damages, has suffered significant loss of wages, benefits, and additional amounts of money that she would have received if she had not been subjected to unlawful retaliation, reputational harm, humiliation, mental anguish and stress, and emotional distress and pain and suffering.

163. Defendant through its agents, servants and employees, has acted willfully, wantonly and maliciously toward Riggs, thus entitling her to punitive damages.

164. Upon information and belief, the officers, directors and managers of Defendant participated in or condoned the conduct constituting the aggravating factors giving rise to punitive damages and entitling Riggs to punitive damages.

**FOURTH CLAIM FOR RELIEF**
**N. C. Unfair and Deceptive Trade Practices Act Violation (NCGS § 75-1.1, et seq)**
**UDTPA Violation**

165. Riggs incorporates by reference paragraphs 1 to 164 above, as though fully set forth herein.

166. Defendant's own written policy states that it was to inform associates, including but not limited to Riggs, about a severance package option, once the company restructure was announced; however, Defendant did not do this, all in violation of its own written policy.

167. Defendant was required to give associates, including but not limited to Riggs, a severance packet and option for a severance package, during this restructure process; however, Defendant failed to do this. Upon information and belief this was done with intention to deceive and deprive Riggs, and other employees, of the severance package benefit.

168. Defendant gave severance packages to the co-managers, and did not advise the assistant managers about this severance package, including but not limited to Riggs. Upon

information and belief, this was done to deprive Riggs, and the other associates, of the severance package benefits, which would result in a substantial financial gain for the Defendant.

169. Defendant benefited financially from not having to pay out these severance packages. Riggs and other associates were demoted, quit or took other jobs. The associates were not given the option of the severance package and this was in violation of Defendant's own written policy. Upon information and belief, this was done to discriminate, deprive and keep significant benefit options from the associates, including but not limited to Riggs.

170. Once Riggs was illegally demoted, with a corresponding $20,000.00 pay cut, she responded to a request for comment to Defendant corporation. Riggs filed her comments with Defendant, and only after all of this, was she told about the severance package option.

171. Riggs had already been demoted. Riggs felt like she was mislead and conned into stepping-down. Riggs could have left Defendant as an assistant manager; instead, she was demoted to a third-shift hourly stocker position. Defendant forced her to take a significant pay cut of $20,000.00. Defendant tried to keep Riggs' vacation pay.

172. Riggs complained to the CEO, by way of the survey, brought it to his attention, and he ultimately offered her the severance package. However, the damage had been done, as Riggs had already been demoted, humiliated, embarrassed, discriminated against due to her age and gender, and subjected to a hostile work environment, ultimately resulting in a $20,000.00 per year pay cut, from a salaried assistant manager to an hourly third-shift stocker position.

173. Riggs was told that the failure to offer the severance package, to her, and other associates, was something it might have "overlooked." This is a significant financial benefit to the associates and "overlooking" this is not believable.

174. Upon information and belief, Defendant knew what it was doing, in misleading the associates regarding the severance package option, thus benefiting Defendant financially and harming Riggs, and other associates, financially.

175. Riggs told Kevin Houston ("Houston"), also an Assistant Manager, in the Hickory Store, about the severance package option. When Defendant tried to demote Houston, he told Defendant, "No, I am not stepping down and I want my severance packet." He was not going to take the demotion, because there was a severance package option. Defendant then let Houston keep his job, keep his pay, keep his title, and offered him the severance packet. This is a younger male employee, who was treated differently than Riggs, who's pay was cut by $20,000.00 and forced to take a third-shirt, hourly stocker job, from a salaried Assistant Manager position.

176. Defendant, in an effort not to draw to much attention, let Houston continue to work in his Assistant Manager position. Defendant did not give Riggs, or Grier, this option. Riggs was told she had to go outside the market, step-down or not have a job. Riggs was not kept on in her position. Riggs was thus treated differently than a similarly situated, younger male employee, further subjecting Riggs to age and gender discrimination.

177. Riggs and Grier were not given the severance package option, and were forced to step-down. Riggs and Grier are protected employees under the ADEA. Houston was a younger, white, male, similarly situated employee, and was treated differently. Houston also had less seniority than either Riggs or Grier.

178. Defendant offered the severance package to Houston, upon him finding out about it. Upon information and belief, Defendant did not offer the packet to Riggs due to her age, gender and an overall intention and scheme to deceive Riggs, and other associates.

179. Defendant has (1) committed an unfair and deceptive act or practice, (2) the action was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff, Riggs, all in violation of the UDTPA.

180. Once Defendant offered Riggs a severance package, they offered the severance package to Grier; upon information and belief, Defendant was trying to "back track" and "cover their tracks" of deception, misleading, and denying employees of severance benefits.

181. Defendant offered the severance package to Houston, because it was stuck in a corner at that point, but did not offer the severance package to the numerous displaced associates in the restructure, all in violation of its own policy, as it was required to do under its written policy, is a violation of the North Carolina Unfair and Deceptive Trade Practices Act.

182. The younger, white, male employee, Houston, was treated differently than Riggs, an older female employee, as well as Grier, an older African-American employee, all to Riggs' damage, loss of income, emotional distress, mental anguish, embarrassment and harassment.

183. The failure to follow its own written policy, and deny associates of their severance package benefit, is "in or affecting commerce," has the tendency to, and actually did, deceive the affected associates, and proximately caused significant injury to the plaintiff, Riggs, and other associates. The far-reaching implications of this deception, concerning the severance package policy misinformation to associates gives rise to a violation of the UDTPA in this instance.

184. Upon information and belief, Defendant did not pay out numerous severance packages, under this scheme to deceive and defraud, thus saving itself significant financial advantage. This was Defendant's own written severance policy, withheld from its associates, and would have been a great financial and emotional benefit to the associates.

185. During the restructure, Defendant transferred and displaced many associates, without offering them the severance package option, in violation of its own written severance and restructuring guidelines policies.

186. Many associates just quit, without the knowledge or notice of the severance package or severance package policy, as was required by Defendant's own policy. Many associates were adversely affected by these actions and omissions of the Defendant, by and through its agents, servants and employees.

187. Riggs, and others, were not given the correct information, and in fact were told there was not a severance package policy and that there would not be a severance package. This was intentionally misleading, deceptive and unfair, to Riggs, as well as other associates in the market.

188. Riggs was lied to and intentionally misled by three separate store managers about the severance package policy: Lisa Wright, Store Manager of the Conover store; Kim Hefner, store manager of the Morganton store; and, Leah Brantley, Store Manager of the Granite Falls store.

189. When Defendant answered the EEOC Charge, Defendant submitted a severance policy, that did not match the true information in the Defendant's own, revised, management guidelines, severance package policy.

190, Defendant stated that Riggs was not a good employee and that she did not deserve a severance package. However, the guidelines state that Defendant could not use any negative evaluations or disciplinary actions against associates, including but not limited to Riggs, during the restructuring process. This was yet another false and misleading misrepresentation of fact.

191. In her reply to the EEOC, Riggs submitted the entire severance policy to the EEOC, that actually states the true severance policy, in regards to management guidelines, as to how Defendant was supposed to help associates in finding another position, equal to their current position, let associates actively search for work outside the Defendant market, while still employed with Defendant, as well as supposed to let associates transfer to another position, and not let any evaluation or disciplinary actions keep the associates from transferring, and offer the severance package option.

192. Defendant was supposed to offer the severance package option and give associates a severance packet at the time the restructure was announced to that associate, including but not limited to Riggs. These actions and omissions by Defendant are an unfair and deceptive act or practice, in or affecting commerce, have the tendency and actually did deceive the associates, and also included a misleading submission and thus misleading the EEOC investigator and its investigations, and proximately causing injury to the plaintiff, Riggs, and other associates, thus entitling Riggs to damages under the UDTPA in this case, and under those circumstances, as those circumstances are so egregious as to entitle Riggs to the damages outlined in the UDTPA.

193. Upon information and belief, Defendant wanted to get rid of older employees, and they intentionally went after them, trying to replace them with less expenses younger associates, and not advising associates of the severance package policy would help allow this to happen.

194. As a direct and proximate result of Defendant's violation of the North Carolina Unfair and Deceptive Trade Practices Act, Riggs has been damaged financially, incurring pecuniary and non-pecuniary damages, and suffered mental anguish and emotional distress.

195.  Under these outlined facts and circumstances, Riggs is entitled to treble damages, costs and a reasonable attorney's fee, as by law allowed, in accordance with the North Carolina Unfair and Deceptive Trade Practices Act, as just compensation for the Defendant's deceptive actions, surrounding the misleading of Riggs, and other associates, regarding the severance package policy and options, during the restructure process.

## FIFTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress

196.  Riggs incorporates by reference paragraphs 1 to 195 above, as though fully set forth herein.

197.  The acts and omissions of the Defendant, in exhibiting an ongoing pattern of harassment, discrimination, demotion to third-shirt hourly work with a corresponding $20,000.00 reduction in wages from a salary to an hourly job, the intentional failure to offer Riggs employment opportunities, the intentional failure to offer Riggs employment opportunities that were then offered to substantially younger, male, associates; the intentional comments to Riggs about her age and health conditions in front of other associates, the failure to evenly administer and apply discipline for Riggs when compared to other younger, male associates, all together under a totality of the circumstances exhibit intentional and extreme behavior intended to cause Riggs emotional distress.

198.  Riggs was consistently worried about keeping her job, when she had worked for Defendant for many years, given the pervasive treatment outlined herein.

199.  Riggs was initial told she had until October of 2021 to make a decision about her career path and the company restructure, when at the last-minute, in April 2021, Riggs was told that she would need to either (1) quit, (2) get another job in the market or (3) step-down to a third-shift stocker job, from a salaried Assistant Manager position, with a corresponding $20,000.00 reduction in pay.

200.  Defendant intentionally removed available jobs out of its job search system, thus effectively blocking Riggs from applying for any open positions.

201.  Defendant demoted Riggs to a third-shift, hourly stocker position, from a salaried Assistant Manager position, making $20,000.00 less per year, and intentionally misled and failed to provide her with the severance package option, as described above, in violation of Defendant's own written policy to do so, in violation of Defendant's own written policy.

202.  Basically every associate in Riggs store and those in surrounding stores all heard and knew of Riggs demotion to third-shift hourly stocker from salaried Assistant Manager.

203.  Riggs was forced to take a significant pay cut and had to go into her 401(k) retirement savings plan to survive, thus adding to her financial stress and strain, directly caused by the intentional acts and omissions of Defendant.

204. Riggs suffered mental stress and physical stress of working third shift, after being in a salaried position on first and second shift prior to the restructure.

205. Atwood insulted and intentionally inflicted emotional abuse on Riggs, regarding her age, by their comments and actions, in humiliating Riggs in front of other associates, intentionally removing her associates from her, and announcing this over the store intercom and walkie-talkies, for the whole store to hear, this was all done in a pattern and with consistency so as to inflict significant emotional distress upon Riggs, wherein she had to take a medical leave of absence and see her doctor and psychiatrist, regarding this unreasonable, extreme and outrageous behavior.

206. Riggs suffered embarrassment of losing her position and being forced to take a third-shift hourly stocker job, after being a salaried Assistant Manager.

207. Defendant intentionally misled and lied to Riggs about the status of a severance package, that should have been advised about and offered to Riggs, which was not. In fact, Riggs was told by three managers that there was no severance package.

208. Riggs was made physically sick, by the mistreatment of Defendant, including but not limited to, being told to come into work at an early shift to complete from putting of freight out and then when she arrived at work, over the store intercom, Hefner instructed an associate to announce that Riggs' associates in her area of apparel were needed in other areas, leaving Riggs alone to unload the heavy freight, which was an impossible task. This culmination of mistreatment was too much for Riggs to take and she had to take a leave of absence.

209. Defendant approved the leave of absence due to work stress, then tried to change this decision regarding the approve leave due to work stress; however, Riggs' doctor had already written her out and she was already approved for said leave.

210. These actions and omissions of the Defendant are extreme and outrageous conduct, intended to and, does in fact, proximately cause severe emotional distress to Riggs, as ultimately manifested in Riggs having to take a leave of absence from her job, due to the work stress.

211. Riggs suffered loss of income, other pecuniary damages, mental anguish, emotional distress, embarrassment, humiliation with her other associates, loss of sleep and anxiety, as a direct and proximate result of Defendant's extreme and outrageous conduct and intentional infliction of emotional distress.

212. Defendant's actions were willful and wanton conduct, intentional, extreme, outrageous and malicious, entitling Riggs to punitive damages.

213. Upon information and belief, the officers, directors and managers of Defendant participated in or condoned the conduct constituting the aggravating factors giving rise to punitive damages and entitling Riggs to punitive damages.

## SIXTH CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress

214.  Riggs incorporates by reference paragraphs 1 to 213 above, as though fully set forth herein.

215.  The acts and omissions of the Defendant, in exhibiting an ongoing pattern of harassment, discrimination, demotion to third-shirt hourly work with a corresponding $20,000.00 reduction in wages from a salary to an hourly job, the failure to offer Riggs employment opportunities, the failure to offer Riggs employment opportunities that were then offered to younger, male, associates, the comments to Riggs about her age and health conditions in front of other associates, the failure to evenly administer and hand-down discipline for Riggs and other younger, male associates, all together exhibit an extreme behavior intended to cause Riggs emotional distress.

216.  Riggs was worried about keeping her job, when she had worked for Defendant for many years.

217.  Riggs was told she had until October of 2021 to make a decision about the restructure, when at the last minute, in April 2021, told to quit, get another job in the market or step-down to a third-shift stocker job, from a salaried Assistant Manager position.

218.  Defendant took jobs out of the system blocking Riggs from applying for the open positions.

219.  Defendant demoted Riggs to a third-shift stocker position, from a salaried Assistant Manager position and intentionally misled and failed to provide her with the severance option, as was Defendant's written policy to do so, all in violation of same.

220.  Everyone in Riggs store and those in surrounding stores all heard and knew of Riggs demotion to third-shift stocker from salaried Assistant Manager.

221.  Riggs was forced to take a significant pay cut and had to go into her 401(k) retirement savings plan to survive, thus adding to her financial stress and strain, directly caused by the intentional acts and omissions of Defendant.

222.  Riggs suffered mental stress and physical stress of working third shift, after being in a salaried position on first and second shift prior to the restructure.

223.  Atwood insulted and inflicted emotional abuse on Riggs, regarding her age.  This is a breach of Atwood's duty of due care to Riggs.

224.  Riggs suffered embarrassment of losing her position and being forced to take a third-shift hourly stocker job, after being a salaried Assistant Manager.

225.  Defendant misled and lied to Riggs about the status of a severance package, that should have been advised about and offered to Riggs, which was not.  In fact, Riggs was told by three managers that there was no severance package.  This is a breach of Defendant's duty of due care to Riggs.  This is a also a breach of its duty of good faith and fair dealing owed to Riggs.

226.  Riggs was made physically sick, by the mistreatment of Defendant, including but not limited to, being told to come into work at an early shift to complete from putting of freight out and then when she arrived at work, over the store intercom, Hefner instructed an associate to announce that Riggs' associates in her area of apparel were needed in other areas, leaving Riggs alone to unload the heavy freight, which was an impossible task.  This culmination of mistreatment was too much for Riggs to take and she had to take a leave of absence.  Defendants actions and omissions amount to numerous breaches of its duty of due care owed to Riggs, through its agents, servants and employees, who ultimately breached their duties of due care to Riggs, directly and proximately causing damages to Riggs, including but not limited to mental anguish and emotional distress.

227.  Hefner's numerous malicious actions towards Riggs, are breaches of her duty of due care owed to Riggs.  These actions and omissions directly and proximately caused damages to Riggs, including but not limited to mental anguish and emotional distress.

228.  Defendant approved the leave of absence due to work stress, then tried to renege on the approve leave due to work stress;  however, Riggs' doctor had already written her out and she was already approved for said leave.

229.  These actions and omissions of the Defendant are reckless, negligent and extreme and outrageous conduct, all in violation of its duty of due care owed to Riggs, proximately causing severe emotional distress to Riggs, as ultimately manifested in Riggs having to take a leave of absence from her job, due to the work stress.

230.  Riggs suffered loss of income, other pecuniary damages, mental anguish, emotional distress, embarrassment, humiliation with her other associates, loss of sleep and anxiety, as a direct and proximate result of Defendant's breaches of its duty of due care owed to Riggs, thus negligently inflicting Riggs with emotional distress and mental anguish.

225.  Defendant's actions were willful and wanton, intentional, extreme, outrageous and malicious, entitling Riggs to punitive damages.

226.  Upon information and belief, the officers, directors and managers of Defendant participated in or condoned the conduct constituting the aggravating factors giving rise to punitive damages and entitling Riggs to punitive damages.

## SEVENTH CLAIM FOR RELIEF
### Intentional Misrepresentation

227.  Riggs incorporates by reference paragraphs 1 to 213 above, as though fully set forth herein.

228. The actions of the Defendant outlined herein this Complaint show (1) numerous false representations as outlined herein, (2) of material facts, (3) made intentionally and knowingly by the Defendant its agents, servants and employees, acting within the course and scope of their employment, (4) with the intent to mislead Riggs, and (5) a reliance by Riggs on this false representations, (6) resulting in damages to Riggs.

229. Riggs has suffered loss of income, other pecuniary damages, mental anguish, emotional distress, embarrassment, humiliation with her other associates, loss of sleep and anxiety, as a direct and proximate result of Defendant's intentional misrepresentations.

230. Defendant's actions were willful and wanton, intentional, extreme, outrageous and malicious, entitling Riggs to punitive damages.

231. Upon information and belief, the officers, directors and managers of Defendant participated in or condoned the conduct constituting the aggravating factors giving rise to punitive damages and entitling Riggs to punitive damages.

## DEMAND FOR JURY TRIAL

232. Pursuant to Federal Rule of Civil Procedure, Rule 38, Riggs hereby demands a jury trial for all issues involved in the above-entitled action.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, Karen M. Riggs, prays this Honorable Court for the following relief:

1. For a judgment in favor of Riggs regarding the **First Claim for Relief**, for Violation of 29 U.S.C.A. §§ 621 to 634, the *Age Discrimination in Employment Act*, entitling Riggs to back pay, front pay, compensation for lost benefits, liquidated damages, costs, reasonable attorney fees, and such other legal or equitable relief that this Honorable Court deems just and proper.

2. For a judgment in favor of Riggs, regarding her **Second Claim for Relief**, for Violation of *Title VII, for Gender Discrimination*, for compensatory damages, including back pay, front pay, compensation for lost benefits, liquidated damages, costs, reasonable attorney fees, and such other legal or equitable relief that this Honorable Court deems just and proper.

3. For a judgment in favor of Riggs regarding the **Third Claim for Relief**, for *Retaliation*, for compensatory damages, including back pay, front pay, compensation for lost benefits, liquidated damages, costs, reasonable attorney fees, and such other legal or equitable relief that this Honorable Court deems just and proper.

4.  For a judgment in favor of Riggs, regarding her **Fourth Claim for Relief**, for violation of the *North Carolina Unfair and Deceptive Trade Practices Act*, including but not limited to treble damages, costs and attorney fees, as by law allowed.

5.  For a judgment in favor of Riggs, regarding her **Fifth Claim for Relief**, for *Intentional Infliction of Emotional Distress*, for compensatory damages, including but not limited to economic and pecuniary loss, mental anguish and emotional distress, reputational harm, humiliation, including an amount for punitive damages for the malicious actions of the Defendant.

6.  For a judgment in favor of Riggs, regarding her **Sixth Claim for Relief**, for *Negligent Infliction of Emotional Distress*, for compensatory damages, including but not limited to economic and pecuniary loss, mental anguish and emotional distress, reputational harm, humiliation, including an amount for punitive damages for the malicious actions of the Defendant.

7.  For a judgment in favor of Riggs, regarding her **Seventh Claim for Relief**, for *Intentional Misrepresentation*, for compensatory damages, including but not limited to economic and pecuniary loss, mental anguish and emotional distress, reputational harm, humiliation, including an amount for punitive damages for the malicious actions of the Defendant.

8.  Entry of judgment in favor of Riggs for all **costs** associated with this action, as by law allowed.

9.  Entry of judgment in favor of Riggs for **reasonable attorney's fees** incurred in the prosecution of this action, as by law allowed.

10.  Entry of judgment in favor of Riggs for **prejudgment interest**, as by law allowed.

11.  For such **other and further relief to which Riggs is entitled**, that this Honorable Court deems just and proper.

This the 23rd day of September, 2022.

*/s/ J. Elliott Field*
J. Elliott Field
N.C. State Bar No.  21679
216 N. McDowell St., Ste. 100
Charlotte, NC 28204
Telephone: (704) 334-3747
Facsimile: (704) 334-3748
E-mail:  efieldjd@gmail.com

*Attorney for Plaintiff*